**Federal Defenders**
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

David E. Patton
*Executive Director*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

September 28, 2023

**By ECF & Email**

The Honorable Jesse M. Furman
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:   **United States v. Ronald Rogers**
      **22 Cr 321 (JMF)**

Dear Judge Furman:

> *"My actions have severely damaged and embarrassed me, my children, family and friends. I . . . deeply apologize. I truly understand how dangerous guns are because I myself have been a victim of gun violence. Words cannot express how truly sorry I am for violating my community."*
>
> --Letter from Ronald Rogers (attached as Ex. A)

Ronald Rogers is deeply sorry for his conduct. He is ashamed of himself. He is taking responsibility. He pleaded guilty without the benefit of a plea agreement, sustaining his first felony conviction. He recognizes and accepts that he will be going to jail for the first time in his life.

Mr. Rogers has had a difficult life. Born into drug addiction, he bounced around foster homes and family members. In spite of those challenges, he excelled at school and in athletics, forging a bright future. When he was 16, while playing basketball, that went away in an instant when a stray bullet lodged into his skull. He was in a coma, and it took him a year to walk, talk, and eat again. He is still paralyzed on the left side of his body and the bullet is still there. Life since then has been difficult and at times adrift. Mr. Rogers believes that his arrest was a needed "wakeup call," and it has pushed him on a path to regain the purpose and focus he has been lacking since he was shot.

In the time since his arrest for this case, Mr. Rogers has worked hard to change his life and to plan for the future. He has been fully compliant with the terms of his pretrial release, including spending more than a year on home detention, without any issues or violations. He also started a business with his new wife Khia, became a

stepfather to her daughter, and moved from Georgia to New York after a tornado destroyed the home he was sharing with his mother. At the conclusion of this case, Mr. Rogers has achievable goals and a support system to return to; these two pillars combined with outpatient mental treatment should form a strong foundation to ensure that this is his last contact with the criminal justice system.

Mr. Rogers stands before the Court after pleading guilty to conspiring to traffick firearms as well as trafficking firearms, in violation of 18 U.S.C. §§ 371 & 922(a)(1)(A). As a victim of horrific and random gun violence himself, Mr. Rogers recognizes the risk of harm he caused by transporting guns from Georgia to New York and selling them without a license. Although this is his first felony conviction and there is strong mitigating evidence that the Court will consider under 18 U.S.C. § 3553(a), Mr. Rogers accepts that due to the nature of the offense conduct, a period of incarceration is appropriate for his crime. Given each of the Section 3553(a) factors, Mr. Rogers's exceptional period of pretrial release, strong familial support, the mitigating circumstances of his upbringing, and the myriad of collateral consequences that come with accepting responsibility for his first felony offense, the defense respectfully requests the Court sentence Mr. Rogers to a year and a day in prison. Such a sentence would be sufficient, but not greater than necessary, to punish Mr. Rogers for his crime.

## Mr. Rogers's Difficult Upbringing

Mr. Rogers was born in June 1995. Presentence Investigation Report ("PSR") ¶ 82. He is currently 28 years old. Id. Mr. Rogers was born with crack cocaine in his system because his mother suffered from a debilitating addiction. Id. ¶ 84. See Ex. B (Letter from Linda Rogers). He was taken from his mother and placed in the custody of his Aunt, Hilda Livermore. Unfortunately, Ms. Livermore was addicted to drugs as well. His sister Tonnie Coggins remembers, "We went from one addict (our mother) to another (our aunt)." Ex. C (Letter from Tonnie Coggins); PSR ¶ 84. Because of this instability and accompanying poverty, Mr. Rogers's childhood was very difficult. His sister, Alicia Rogers writes, "We grew up in homes where there was physical, mental, emotional and drug abuse. We had little guidance and were essentially raising ourselves." Ex. D (Letter from Alicia Rogers). Additionally, because Mr. Rogers was so young, he "grew up thinking his cousins were his siblings and his actual siblings were his cousins." Ex. C. His sister Tonnie Coggins describes learning the truth to be "traumatic" for Mr. Rogers as well as for herself. Id.

In May 2007, when Mr. Rogers was 12 years old, his uncle Oswald, Ms. Livermore's husband died on Rikers Island. See Ex. E (article on his death and

<u>United States v. Rogers</u>, 22 Cr 321                                      Page 3 of 13
**Sentencing Submission (9.28.23)**

eventual legal settlement). In her grief, Ms. Livermore's addiction took a turn for the worse and Mr. Rogers was again taken from his home and placed in foster care. PSR ¶ 84. He then bounced around between foster homes and other family members, including his sister Latoya's for the next four years. See Ex. F (Letter from Latoya Rogers). Then in 2011, Ms. Livermore settled her lawsuit against the City for two million dollars, and she moved Mr. Rogers and her children to live in Georgia. PSR ¶ 84; Ex. E.

Mr. Rogers almost did not get to make the move. In July 2011, when he was 16 years old, he was playing in a pickup basketball game when a stray bullet struck him in the head. PSR ¶ 93. After several weeks in a coma, Mr. Rogers spent the next several months in the hospital. <u>Id.</u> His sister Alicia remembers: "After 2 weeks in a coma fighting for his life, the swelling in his brain finally went down and he opened his eyes. He had to learn to walk, talk, everything all over again. As if he was a baby." Ex. B. Latoya explains that it took more than a year for Mr. Rogers to be able to walk again, <u>see</u> Ex. F, and the bullet remains lodged in his brain, paralyzing the left side of his body. He met Rhoda Francis during his initial rehab, where they "formed a life-long mentorship and became extended family." Ex. G (Letter from Rhoda Francis).

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ While on pretrial release he continued to receive physical therapy, and it was recommended that he receive speech, occupational, and psychological counseling to cope with his injuries. <u>Id.</u> Unfortunately, Medicaid denied coverage for the services. <u>Id.</u> ¶ 94.

▇▇▇▇▇▇▇▇▇▇▇ ¶ 99. In school, he was an A student and a star on both the football and baseball teams. <u>See</u> Ex. F. It was likely he was going to receive a scholarship to be a Division I college athlete, and potentially a professional. PSR ¶ 99; Ex. A. His sister Latoya writes, "The pain and thought of not becoming a professional ball player was very depressing for him. He continued to be a loving and respectable kid that everyone loved, but I have seen his sadness and cried many days because I could feel his pain." Ex. F. Mr. Rogers further elaborates, "Sports and school were my life, and they both went away when that stray bullet entered my brain. I was on a lost path trying to find out what I wanted to do in life."

At first, Mr. Rogers had a goal. While completing his initial rehabilitation, Mr. Rogers was "determined" to finish school. Ex. A at 1. He was ultimately successful, graduating from high school in 2015, after years of pushing himself to regain some

control over his body so he could attend classes. PSR ¶ 102. He then set-off into the workforce, but still struggled with depression and listlessness after he lost his opportunity to continue playing sports. See Ex. A. Without school and his community, life was harder for Mr. Rogers.

He first worked with aunt at a restaurant and then for two years at Atlanta's Hartsfield International Airport, where he assisted travelers with disabilities by wheeling them to their gates. Id.; PSR ¶ 112. He then worked for Carter's, the children clothing company, as a packer of clothing, and at a medical center, as part of the janitorial staff. Id. ¶¶ 109–111. He was placed in those positions through a temp-agency. Id. From 2018 to 2020, he worked at Federal Express and then Wayfair, where he helped loading trucks. Id. ¶¶ 107–08. Each of these physically demanding jobs were challenging for Mr. Rogers, who still struggles to use the left side of his body due to his injuries and can't feel the weight of objects when holding them with his left arm.

Mr. Rogers's greatest joy is his family. He has worked hard all of his life because he wants to support his children, and now his new wife, Khia. He has three biological children and is the stepfather to his wife's daughter. Id. ¶¶ 85–87. His kids are young—six, three, two—and his stepdaughter is six. Id. He shares two children with his ex-wife, Anuancia and his oldest with an ex-girlfriend. Id. His sister Alicia writes, Mr. Rogers is a "very hands-on dad." Ex. D. His mother Linda describes him as an "awesome father." Ex. B.

Khia wrote a detailed and thoughtful letter of support. See Ex. H (Letter from Khia Rogers). Khia explains that Mr. Rogers is an amazing parent to her daughter. He packs her lunch, gets her ready for school, and "shows empathy and understanding to her." Her daughter in turn treats Mr. Rogers like her father, and she is always "excited to show him things she has accomplished in school or at home." Id. Many of his family members laud Mr. Rogers's cooking skills, noting that he always prepares food for the family including "cakes and banana pudding." Exs. B & C.

While Mr. Rogers worked steadily after the shooting, he often struggled with his mental health and never sought counseling. He was living in Georgia, feeling depressed, and wishing for a more exciting life back in New York. Because the gun laws in Georgia are far laxer then in New York, a friend from when Mr. Rogers was young asked him to bring him up a gun. Mr. Rogers agreed do it, and he did. After Mr. Rogers did it, the friend's friends began asking for guns as well, and so began Mr. Rogers's offense conduct.

## Offense Conduct

Mr. Rogers and his ex-wife and co-defendant, Anauncia Rogers, transported guns that they legally purchased in Georgia and sold them in New York. PSR ¶¶ 11–51. From September 2018 until March 2022, Mr. Rogers moved a total of 68 guns from Georgia to New York. Id. ¶ 51. Anauncia Rogers would purchase the guns. Id. ¶ 18. Mr. Rogers would then drive the guns to New York and sell them. He would usually bring one to three guns at a time, but on some occasions, he brought more. Mr. Rogers was working throughout the offense conduct period, and this scheme was not his main source of income. Id. ¶¶ 107–08.

The Government notes that throughout the scheme, Mr. Rogers often posted on social media about his activities. While distasteful, these videos and messages are not probative of Mr. Rogers's criminal liability. He was boasting and exaggerating about the money he was making from transporting the guns. In reality, this scheme was a two-person husband and wife conspiracy in which profits were curtailed by their relatively small monthly inventory and the costs associated with each trip to New York. Mr. Rogers enjoyed driving to New York and seeing his friends from before he moved to Georgia, and he was boasting about his experiences on social media.

As quoted at the start of this submission, Mr. Rogers writes at length about his shame and regrets about participating in this crime. See Ex. A at 1. He explains that he entered into this scheme when his adopted mother, Ms. Livermore, had a stroke in 2017 and he was "pretty much left alone in Atlanta." Ex. A. He was 22 years old and "felt lost." Id. At first, he thought he was helping friends, but eventually recognized that the people who were purchasing the guns were "using" him. PSR ¶ 57. He is "deeply sorry" for his actions and has tried to use his period of pretrial supervision to change his life and plan for a productive future. He writes, "this case was the wakeup call I needed to get back on track." Ex. A at 1.

The letters of support further underscore Mr. Rogers's remorse for his actions. His close friend Destiny Stewart writes, "He has been grappling with feelings of regret and remorse for his past actions, and . . . He is determined to learn from his past and use his experiences to grow and improve as an individual." Ex. I (Letter from Destiny Stewart). His wife Khia believes that Mr. Rogers "knows he made a terrible mistake, and he shows deep repentance every day." Ex. H.

Mr. Rogers was arrested on May 24, 2022. Id. ¶ 49. He was released on home detention on May 26, 2023. Id. at 1. He was indicted on June 7, 2022, and the case

was assigned to this Court. United States v. Rogers, 22 Cr. 321, ECF No. 8 (S.D.N.Y. Jun. 7, 2022). On June 29, 2023, Mr. Rogers pleaded guilty to the indictment without the benefit of a plea agreement. Id., ECF No. 48.

## Mr. Rogers's Post-Arrest Conduct

Once he was released on bail, Mr. Rogers set out to begin his rehabilitation. After a short period of unemployment, he was hired at GXO Warehouse, where he handled bread for Pepperidge Farms. He also worked as a delivery person for Door Dash and Uber Eats. Id. ¶¶ 105–06; Ex. A. He continued in both of these jobs until a tornado destroyed his home in Georgia in January 2023, and he moved back to New York to live with his then girlfriend, Khia. PSR ¶ 89.

After moving to New York, Mr. Rogers and Khia married in June 2023. Id. ¶ 87. Khia works at Red Lobster. Id. His close friend Destiny Stewart thinks they make a good match and believes that the "presence of a caring partner has been instrumental in his efforts to become a better person." Ex. I. Together, Mr. Rogers and Khia started a car rental business—renting their 2017 Hyundai Sonata. PSR ¶ 104. They incorporated the business, got the necessary insurance, and have been renting the car out steadily (although they have yet to turn a profit). Id.; Exs. A & H. Additionally, Mr. Rogers has been voluntarily participating the Urban Unbound program, where he just recently began a new job at A & A Maintenance and will soon complete his OSHA-30 hour and 10-hour site safety training. Ex. A at 1.

Mr. Rogers has done much over the past 16 months since his arrest. He has built a beautiful family with his wife Khia and her daughter. He has started a business and worked steadily. He does not use drugs or alcohol, and has tested negative each time has been tested. PSR ¶¶ 100–01. Moreover, he has been fully compliant with the terms of his pretrial release. In fact, after 13 months on home detention, Pretrial approached the defense and recommended reducing his supervision from home detention to a curfew, which the Court granted. PSR at 2; ¶¶ 7–8; ECF No. 47 (Jun. 23, 2023). Each of these accomplishments and positive steps show that Mr. Rogers is more than a person who trafficked firearms. He is redeemable and remorseful and has an excellent chance to be successful after this case is over.

His barber and friend Eric Jones provides a useful synopsis. See Ex. J (Letter from Eric Jones). He writes, "I believe that Ronald Rogers is a person of immense character, compassion, and potential." Id. He also notes that he has come to know Mr. Rogers as a "kind, supportive, and generous person." Id. This belief is underscored in the additional letters from his family and friends. Mr. Rogers is not a person who has committed himself to a life of crime regardless of the costs. To the contrary, he made

a prolonged and profound mistake, and he stands before the Court taking full responsibility for his actions without any benefit from the Government.

Towards the end of his letter, Mr. Rogers writes, "While I am incarcerated, I will use my time to study and learn business. . . . I have big dreams and a bright plan for my future although I made the poor decisions to commit the crime that I plead guilty to." Ex. A. With this positive outlook, excellent progress while on pretrial supervision, his lack of prior felony conviction, and his deep remorse, Mr. Rogers demonstrates that he is more than his crime and worthy of the Court's leniency at sentencing.

### The Most Appropriate Sentence: One Year and One Day in Prison

Mr. Rogers is scheduled to be sentenced on Thursday, October 12, 2023 after he pleaded guilty to one count of conspiring to traffic firearms and one count of trafficking firearms in violation of 18 U.S.C. §§ 371 & 922(a)(1) and (2). Each count has a statutory maximum of 60 months in prison. PSR at 1. Probation recommends a sentence of 60 months concurrent on counts 1 and 2. PSR at 30. The Guidelines in this case are merely advisory, and the Court "may not presume that the Guidelines range is reasonable," but rather "must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. 38, 50 (2007).

Section 3553(a) of Title 18 of the United States Code mandates that the Court impose a sentence "sufficient, but not greater than necessary" to achieve the goals of retribution, deterrence and rehabilitation. The Second Circuit has explained that, "[i]n deciding what sentence will be 'sufficient, but not greater than necessary' . . . a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." United States v. Singh, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks omitted). Considering each of the goals of sentencing with a "generosity of spirit," a sentence of one year and one day in prison is the most just and appropriate sentence for this case.

### The Guideline Calculation

The defense objects to Probation's calculation of the advisory Guideline Range in this case. Specifically, the defense objects to the proposed four-point enhancement pursuant to U.S.S.G. § 2K2.1(b)(6)(B).

If the Court agrees with the defense's calculation, the total offense level would decrease from 29 to 25. See PSR ¶¶ 58–71. The defense agrees with Probation that Mr. Rogers is in criminal history category I because he has 1 criminal history point for a shoplifting misdemeanor. Id. ¶¶ 76–77. With a total offense level of 25 and a

**United States v. Rogers, 22 Cr 321**                                        Page 8 of 13
**Sentencing Submission (9.28.23)**

criminal history category of I, the defense contends the correct Guidelines range in this case is 57 to 71 months. See U.S.S.G. chap. 5. Pt. A (sentencing table).

    I.    U.S.S.G. § 2K2.1(b)(6)(B) does not apply as a matter of law.

U.S.S.G. § 2K2.1(b)(6)(B) calls for a four-point enhancement when a defendant "transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense."[1] As a matter of law, this enhancement cannot apply in this case. In United States v. Young, 811 F.3d 592, 601 (2d Cir. 2016), the Circuit held:

> "when a defendant receives a sentencing enhancement for 'trafficking' in firearms under § 2K2.1(b)(5), Application Note 13(D) to § 2K2.1 prohibits imposition of an enhancement under 2K2.1(b)(6)(B) based on the defendant's transfer of a firearm with reason to believe it will be used in another felony offense.

Id. Mr. Rogers does receive a four-point enhancement under U.S.S.G. § 2K2.1(b)(5). See PSR ¶ 63. Therefore, Young does not allow applying a Section 2K2.1(b)(6)(B). enhancement in this case.

From the legally correct starting place of 57 to 71 months, the defense respectfully requests the Court impose a sentence of one year and one day in prison with three years of supervised release. Mr. Rogers takes full responsibility, has been on a positive and rehabilitative path, and he is deeply remorseful for his actions. He has a strong community surrounding him, and he has the drive and desire to no not return to crime. A lengthy prison sentence is not necessary to ensure that point or punish him further—this is his first felony conviction and jail sentence of any kind will be sufficient. A year in the federal bureau of prisons will be harrowing and difficult. A lengthier sentence would be too harsh a punishment given his history and characteristics. Moreover, it would hamper Mr. Roger's ability to transition successfully back into his community. The goals of sentencing are achieved in his case by a sentence of one year and one day.

---

[1] Probation recommends this enhancement because Mr. Rogers sent a text message in January 2021 postulating that the guns he was selling may be used in a future shooting. See PSR ¶ 12. While this text is regrettable (and, to be clear, Mr. Rogers does regret sending it and for his posts on social media throughout his scheme), it does not establish what this enhancement is designed to punish.

<u>United States v. Rogers</u>, 22 Cr 321  Page 9 of 13
Sentencing Submission (9.28.23)

I.    **Mr. Rogers's History and Characteristics Call for a Sentence of One Year and One Day.**

Mr. Rogers has had a traumatic and turbulent life. When he was child, his family was plagued by addiction, and he was separated from his parents and put in foster care. As a result, he never truly had an opportunity to learn what it meant to feel safe in a home. That was just the beginning. When asked by Probation to describe his life, he listed "various traumatic events:"



PSR at 32. Probation goes on to note that despite these changes, Mr. Rogers graduated from high school. <u>Id.</u> This is all the more impressive given the was unable to walk or talk after the gunshot wound to the head he sustained in 2011. Additional strengths include the fact that Mr. Rogers has worked steadily since high school, has no prior felony conviction and only one misdemeanor for shoplifting, and he has never been incarcerated previously.

That Mr. Rogers will be successful in the community is demonstrated by his excellent record of pretrial supervision. He was subject to home detention for 13 months without any violations. He never used drugs, and he was always where he needed to be. That is effort demonstrates his respect for the law and ability to follow strict rules. Given his age and prospects, the defense is confident this will be Mr. Rogers only ever felony conviction.. He is committed to leading a law-abiding and productive life when this case is over. <u>See</u> Ex. A.

Both the challenges he experienced and his strengths illustrate that Mr. Rogers is capable of being successful in the community. A sentence of one year and one day in prison is most appropriate because it accounts for his challenges as well his personal strengths and exemplarily post-arrest conduct.

## II. The Nature & Circumstances of Mr. Rogers's Crime Do Not Require a Period of Incarceration Beyond One Year and One Day.

Mr. Rogers's offense conduct is unquestionably serious. He accepts that a term of incarceration is appropriate in this case. However, for a number of reasons, a variance to a year and one day is appropriate.

First, this case represents Mr. Rogers's first and only felony conviction. A first felony conviction is itself a significant sanction carrying life-altering collateral consequences. See generally United States v. Nesbeth, 188 F. Supp.3d 179, 182 (E.D.N.Y. 2016) (Block, J.) ("Today, the collateral consequences of a felony conviction form a new civil death. Convicted felons now suffer restrictions in broad ranging aspects of life that touch upon economic, political, and social rights."). Given these harsh sanctions, additional time in prison beyond one year and one day is not appropriate in this case, especially given that Mr. Rogers has not spent any time in prison in his life other than the two days at the start of this case.

Second, Mr. Rogers's forthright and detailed contrition in his letter to the Court and in his discussions with Probation demonstrates a clear acceptance of responsibility and positive steps towards his rehabilitation. See Ex. A. By not attempting to justify his conduct or minimize his behavior, Mr. Rogers recognizes that his crime was serious and deserving of punishment.

Should the Court accept the defense's recommend sentence, it would not create an unwarranted sentencing disparity. See 18 U.S.C. § 3553(a)(6). In most years, courts in this District grant variances in around 65 to 70% of firearms cases. See Ex. K (collected data). As such, a sentence below the Guideline range, including a sentence of one year and one day in prison, would be completely in-line with District norms, even in the context of firearm trafficking. See, e.g., United States v. McCray, 18 Cr. 34, ECF No. 13 (S.D.N.Y. Jul. 09, 2018) (Torres, J.) (sentencing a defendant convicted of gun trafficking to one day in prison); United States v. Hall, 21 Cr. 643, ECF No. 59 (S.D.N.Y. Dec. 6, 2022) (Carter, J.) (sentencing a defendant convicted of gun trafficking to time served).

## III. Mr. Rogers's Need for Treatment Calls for a Sentence of one year and one day in Prison.

Section 3553(a)(2)(D) requires the Court to consider Mr. Rogers's need for treatment in crafting a just sentence. Probation recommends as a special condition that Mr. Rogers participate in a mental health treatment in the community, given the trauma he has experienced. PSR at 35. Given this need, the Court should craft a

<u>United States v. Rogers</u>, 22 Cr 321                                    Page 11 of 13
**Sentencing Submission (9.28.23)**

sentence that allows Mr. Rogers to get the help he needs. The Court is well aware of the deficiencies with the Bureau of Prison's mental health care apparatus, and it is unlikely Mr. Rogers will receive mental health treatment while incarcerated. This is especially true given the unprecedented staff shortage the Bureau is experiencing. In 2016, the Department of Justice Inspector General issued an alarming report on conditions within the BOP. <u>See</u> U.S. Dep't of Justice, Office of Inspector Gen., <u>The Impact of an Aging Inmate Population on the Federal Bureau of Prisons</u> (Rev. Feb. 2016).[2] These staffing shortages and the problems they caused have only been exacerbated by the COVID-19 pandemic, during which the BOP lost even more trained staff and the medical needs of inmate populations increased exponentially. <u>See, e.g.,</u> Walter Palvo, <u>Federal Bureau of Prisons' Medical Care Falls Short Of Its Own Policy</u>, FORBES (Apr. 2022) ("standards are being compromised as a result of staffing shortages that the agency has faced for years now").[3] A sentence of a year and day will allow for punishment but also ensure Mr. Rogers receives treatment in a reasonable time frame.

    **IV.   Conditions of Confinement Warrant a Shorter Sentence than in Other Times.**

In many BOP facilities, inmates are constantly locked down to account for the lack of staff available. If the Court sentences Mr. Rogers to a lengthy term of incarceration, he will suffer more than if the BOP was appropriately staffed. The defense respectfully requests the Court account for the current challenges in the BOP in crafting a just sentence.

    **V.   A Sentence of one year and one day in prison serves both Individual and General Deterrence.**

A punishment of one year and one day is adequate punishment to deter Mr. Morgan from committing further crimes. As he described in his letter to the Court, the lessons of sentencing have been learned. <u>See</u> Ex. A. Research shows that a more

---

[2]   <u>Available at</u> https://oig.justice.gov/reports/2015/e1505.pdf (last visited Jul. 18, 2023).

[3]   <u>Available at https://www.forbes.com/sites/walterpavlo/2022/04/19/federal-bureau-of-prisons-medical-care-falls-short-of-its-own-policy/?sh=7b7917635eab (last visited Jul. 18, 2023).</u>

severe sentence does not lead to greater specific deterrence for individual defendants. See The Honorable Peggy Fulton Hora & Theodore Stalcup, Drug Treatment Courts in the Twenty-First Century: The Evolution of the Revolution in Problem-Solving Courts, 42 GA L. REV. 717, 724 (2008).

Furthermore, sentencing defendants to severe sentences does not result in greater general deterrence. See Michael Tonry, Purposes and Functions of Sentencing, 34 CRIME AND JUSTICE: A REVIEW OF RESEARCH 28–29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."). Evidence-based studies strongly support the conclusion that it is the certainty of being prosecuted rather than the severity of punishment that deters crime. See Nat'l Inst. of Just., Five Things About Deterrence (Jun. 6, 2016).[4] The fact that Mr. Rogers was caught, prosecuted in federal court, and sent to prison despite having a prior felony record will provide sufficient general deterrence; further incarceration is not required. This is especially true in this case given Congress's amendment to the gun trafficking laws after this case was filed. Whatever the outcome, it will not precedential as the new amendments will govern future cases.

## Conclusion

Mr. Rogers is deeply sorry for his actions. Given his history and characteristics and excellent performance on pretrial supervision, a significant variance is warranted. The defense respectfully requests that the Court sentence Mr. Rogers to one year and one day in prison followed by a term of supervised release.

---

[4] Available at https://nij.gov/five-things/pages/deterrence.aspx (last visited Sept. 28, 2023).

**United States v. Rogers, 22 Cr 321**                             Page 13 of 13
**Sentencing Submission (9.28.23)**

                                          Very Truly Yours,

                                          /s/
                                        Ian H. Marcus Amelkin
                                        Assistant Federal Defender
                                        Federal Defenders of New York, Inc.
                                        52 Duane Street, 10th Floor
                                        New York, NY 10007
                                        Tel.: (212) 417-8733


CC:    Matthrew King, Esq. & Adam Sowlati, Esq.
           Assistant United States Attorneys